ARROWOOD, Judge.
Patrick Michael Mayes ("defendant") appeals from judgments entered on his convictions of manufacturing methamphetamine, possessing or distributing a methamphetamine precursor, and conspiracy to manufacture methamphetamine. For the reasons stated herein, we find no error.
I. Background
On 19 September 2016, defendant was indicted for manufacturing methamphetamine in violation of N.C. Gen. Stat. § 90-95(b)(1a) ; possessing immediate precursor chemicals knowing, or having reasonable cause to believe, that the immediate precursor chemical would be used to manufacture methamphetamine in violation of N.C. Gen. Stat. § 90-95(d1)(2) ; and conspiracy to commit the felony of manufacturing methamphetamine in violation of N.C. Gen. Stat. § 90-98.
Defendant was tried at the 13 December 2016 criminal session of Mitchell County Superior Court, the Honorable Robert G. Horne presiding. The State's evidence tended to show the following: Agent Randy Wood ("Agent Wood"), a North Carolina State Bureau of Investigation ("SBI") drug agent, testified that on 5 February 2016, multiple SBI agents, members of the SBI Special Response Team, members of the Mitchell County SWAT team, detectives and officers of the Mitchell County Sheriff's Department, the clandestine lab unit, and Special Agent Lee Tritt ("Agent Tritt") executed a search warrant for 839 Altapass Church of God Road ("the residence"). Agent Wood had obtained the search warrant based on information that the residence was being used to manufacture methamphetamine. Agent Wood testified that defendant was one of the people in the residence at the time the warrant was executed. He did not know defendant would be there but had "only heard" that defendant may be present. Christopher Grindstaff ("Grindstaff") and Stacy Wise ("Wise") were also found in the residence.
Agent Tritt was tendered and accepted without objection as an expert in the field of clandestine laboratories and the manufacture of methamphetamines. Agent Tritt testified that he was assigned to the clandestine laboratory unit of the SBI since 2004. On 5 February 2016, Agent Tritt reported to the residence. He was responsible for the safety and processing of the clandestine laboratory. Agent Tritt, along with other agents assisting in the search, searched the residence and looked for items related to the manufacture of methamphetamine. A report of Agent Tritt's findings was admitted into evidence without objection and published to the jury. Agent Tritt testified that the following items seized from the residence were consistent with the clandestine manufacture of methamphetamine: a jar of hydrochloric acid; a nasal decongestant containing pseudoephedrine ; ammonium nitrate fertilizer; sodium hydroxide; Coleman fuel; plastic tubing; pill grinder; plastic bottles; pieces of instant cold packs; and an air purifying respirator. Two twenty ounce plastic bottles were found outside of the residence. Agent Tritt testified that both contained granular material and were consistent with the "one pot/shake & bake" method of manufacturing methamphetamine. Agent Tritt opined that this residence was being used to manufacture methamphetamine.
Agent Wood testified that on 18 February 2016, he interviewed defendant at the McDowell County Sheriff's Office. Defendant agreed to waive his rights and signed an Advisement of Rights form. Agent Wood's handwritten notes from the interview were admitted into evidence without objection. In this interview, defendant stated that he met Grindstaff about one year ago. Defendant went to prison in September 2015, and while imprisoned, was told that Grindstaff was "cooking dope." Shortly after he was released in December 2015, he was given "homemade dope" by Grindstaff. Defendant told Agent Wood about the first time he witnessed the manufacturing of methamphetamine. This occurred at the residence of Willie Berry and Grindstaff was present. Defendant stated that he moved into Grindstaff's residence at 839 Altapass Church of God Road in January of 2016. Defendant admitted that in January 2016, he and Grindstaff manufactured methamphetamine on two occasions at the residence. On both occasions, methamphetamine was "cooked" outside on the front porch of the residence. Defendant informed Agent Tritt that he had knowledge of the following items used to manufacture methamphetamine at Grindstaff's residence: pills, pseudoephedrine, Coleman fuel, lithium batteries, ammonium nitrate, and fertilizer bags. He stated that he assisted Grindstaff in manufacturing methamphetamine on a couple of occasions but that Grindstaff did not show defendant the entire process.
Miguel Cruz-Quinones ("Special Agent Cruz-Quinones"), a forensic scientist and special agent with the North Carolina State Crime Laboratory, was tendered and accepted, without objection, as an expert in forensic drug chemistry. Special Agent Cruz-Quinones testified that he received the evidence in this case in a sealed plastic bag. The evidence, labeled as "item one," consisted of two plastic bottles that contained two glass vials of clear liquid. The liquid in the glass vials went through a series of preliminary tests that provided information regarding whether it was a controlled substance. Agent Cruz-Quinones then further analyzed the liquid using a "scientific instrumental technique" to confirm the presence of a controlled substance. He concluded that item one contained 87 grams of liquid containing methamphetamine.
A jury found defendant guilty of all charges. Defendant admitted his status as an habitual felon.
On 15 December 2016, defendant was sentenced to 127 to 165 months for the manufacturing methamphetamine offense. For the offense of possession of methamphetamine precursor chemicals, defendant was sentenced to 127 to 165 months, to run at the expiration of the first sentence. For the offense of conspiracy to manufacture methamphetamine, defendant was sentenced to 127 to 165 months, to run concurrent with the first sentence.
On 19 December 2016, defendant gave notice of appeal.
II. Discussion
A. Petition for Writ of Certiorari
On 12 June 2017, defendant filed a petition for writ of certiorari to review the judgments entered 15 December 2016. Defendant acknowledges that his notice of appeal failed to properly designate the court to which the appeal is taken and does not appear to have been served on the State. In our discretion, we elect to grant defendant's petition for writ of certiorari and address the merits of his appeal.
B. Standard of Review
Defendant did not properly preserve the issue of admissibility of expert testimony by failing to object when the challenged testimony was elicited at trial. However, "an unpreserved challenge to the performance of a trial court's gatekeeping function in admitting opinion testimony in a criminal trial is subject to plain error review in North Carolina state courts." State v. Hunt, --- N.C. App. ----, ----, 792 S.E.2d 552, 559 (2016).
For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.
State v. Lawrence, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (internal citations and quotation marks omitted).
C. Agent Tritt's Testimony
Defendant argues that the trial court plainly erred in accepting Agent Tritt as an expert in the field of clandestine laboratories and in the manufacture of methamphetamine and in admitting his testimony. Defendant contends that Agent Tritt lacked the appropriate training and experience and his principles and methodology were not sufficiently reliable and not reliably applied to the facts of the case.
In State v. McGrady, 368 N.C. 880, 787 S.E.2d 1 (2016), our Supreme Court confirmed that the 2011 amendment of Rule 702 of the North Carolina's Rules of Evidence adopted the federal standard for admission of expert testimony articulated in the Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 125 L.Ed. 2d 469 (1993), line of cases. The text of Rule 702, in pertinent part, provides:
(a) If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise, if all of the following apply:
(1) The testimony is based upon sufficient facts or data.
(2) The testimony is the product of reliable principles and methods.
(3) The witness has applied the principles and methods reliably to the facts of the case.
N.C. Gen. Stat. § 8C-1, Rule 702(a) (2015).
The McGrady Court held that:
Rule 702(a) has three main parts, and expert testimony must satisfy each to be admissible. First, the area of proposed testimony must be based on "scientific, technical or other specialized knowledge" that "will assist the trier of fact to understand the evidence or to determine a fact in issue." This is the relevance inquiry[.]
....
Second, the witness must be "qualified as an expert by knowledge, skill, experience, training, or education." This portion of the rule focuses on the witness's competence to testify as an expert in the field of his or her proposed testimony.... Whatever the source of the witness's knowledge, the question remains the same: Does the witness have enough expertise to be in a better position than the trier of fact to have an opinion on the subject?
....
Third, the testimony must meet the three-pronged reliability test that is new to the amended rule: (1) The testimony [must be] based upon sufficient facts or data. (2) The testimony [must be] the product of reliable principles and methods. (3) The witness [must have] applied the principles and methods reliably to the facts of the case. These three prongs together constitute the reliability inquiry discussed in Daubert, Joiner, and Kumho. The primary focus of the inquiry is on the reliability of the witness's principles and methodology, not on the conclusions that they generate[.]
McGrady, 368 N.C. at 889-90, 787 S.E.2d at 8-9 (internal citations, footnote, and quotation marks omitted).
First, defendant argues that because Agent Tritt lacked appropriate training and experience in chemistry, the trial court plainly erred by allowing him to testify that several chemical reactions occurred between various ingredients in order to form methamphetamine. In support of his argument, defendant compares Agent Tritt's testimony to the excluded testimony of the expert witness in McGrady. We are not convinced.
In McGrady, the issue at trial was whether the defendant shot and killed his cousin in self-defense and in the defense of his son. McGrady, 368 N.C. at 882, 787 S.E.2d at 5. The defendant sought to have Mr. Dave Cloutier ("Cloutier") testify as an expert in "the science of the use of force" and the State objected. Id. at 883, 787 S.E.2d at 5. Cloutier had worked as an officer of the Goldsboro Police Department for almost sixteen years, and spent eleven years as an instructor with the North Carolina Justice Academy teaching in areas such as "subject control and arrest techniques" and the use of lethal and non-lethal force. Id. at 894, 787 S.E.2d at 11. The defendant sought to use Cloutier's testimony on stress responses to show that the defendant's inability to remember the number of shots he fired and the defendant's testimony that all of his attention was focused on the threat were "consistent with having perceived a threat to his life and the life of his son." Id. at 895-96, 787 S.E.2d at 12-13. Following a voir dire hearing, the trial court concluded that Cloutier was not qualified to offer expert testimony on the stress responses of the sympathetic nervous system. Id. at 895, 787 S.E.2d at 13. Cloutier was not a medical doctor but had studied "the basics" of the brain in general psychology courses in college, had read articles and had been trained by medical doctors on how adrenalin affects the body, had personally experienced perceptual narrowing, and had trained numerous police officers and civilians on how to deal with these stress responses. Id. at 896, 787 S.E.2d at 13. Our Court held that although Rule 702(a) did not create an "across-the-board requirement for academic training or credentials, it was not an abuse of discretion in this instance to require a witness who intended to testify about the functions of an organ system to have some formal medical training." Id.(internal citation omitted).
In the present case, Agent Tritt was "qualified as an expert by knowledge, skill, experience, training, or education[.]" N.C. Gen. Stat. § 8C-1, Rule 702(a). He was a special agent with the Clandestine Laboratory Unit of the SBI since 2004. He testified that in 1992, he received a bachelor of science in criminal justice from Western Carolina University, attended basic law enforcement training at Southwestern Community College, and attended the North Carolina State Bureau of Investigation Special Agent Academy. From December 1992 until February 1999, Agent Tritt was assigned to Mecklenburg County as a drug agent and worked on violent crime task forces, drug task forces, wiretap investigations and drug trafficking and distribution conspiracies. In 1999, he worked with the Diversion and Environmental Crimes Unit for approximately four years. During this period of time, he began to work clandestine laboratories and got involved with methamphetamine labs. Agent Tritt testified that from 2004 until the time of trial, he had received clandestine laboratory safety certification and attended the hazardous materials awareness and operation level certification school. He underwent annual clandestine laboratory re-certification to remain updated on the trends of manufacturing methamphetamine and testified that his unit was "responsible for training the officers that are certified throughout North Carolina, and we conduct the training annually." Since 2000, Agent Tritt had almost 500 hours of training regarding methamphetamine labs. Since 2004, he had processed in excess of 700 clandestine laboratories that included methamphetamine and since 2001, had processed laboratories that utilized the "Red P," Anhydrous Ammonia, Condensed Ammonia, and Shake & Bake/One Pot methods of producing methamphetamine.
Agent Tritt testified that several items seized from the residence were consistent with the clandestine manufacture of methamphetamine and that material obtained from the residence was consistent with the "one pot/shake & bake" method of manufacturing methamphetamine. Agent Tritt ultimately opined that this residence was used to manufacture methamphetamine.
The McGrady Court noted that "the court must look to see whether the witness's knowledge and experience are sufficient to qualify the witness in the particular field of expertise at issue. Different fields require different knowledge, skill, experience, training, or education." McGrady, 368 N.C. at 896, 787 S.E.2d at 13 (citation and quotation marks omitted). Unlike Cloutier's testimony in McGrady, Agent Tritt did not offer testimony in an area outside of his specialized training and experience. Rather, his testimony was directly related to the certifications and training he received in regards to the processing of methamphetamine labs and extensive experience gained as a special agent of the SBI. He was in a better position than the jury to have an opinion on the subject of manufacturing methamphetamine and was qualified to testify as an expert witness in the field of clandestine laboratories and the manufacture of methamphetamines.
In his second argument, defendant challenges the reliability of Agent Tritt's testimony. Defendant contends that Agent Tritt had a "conclusory approach" in the assessment of items seized, gave "vague references" to the guidelines in his field, and his testimony was "bereft of any reference to an error rate, or any standards controlling the operation of the instruments, or any testing conducted to ensure their accuracy."
As to this issue, we recognize the fact that the record is not developed. Had defendant challenged the reliability of Agent Tritt's expert testimony, the trial court could have conducted a voir dire hearing to examine Agent Tritt and submit evidence into the record. Our Court has stated that:
[w]e can envision few, if any, cases in which an appellate court would venture to superimpose a Daubert ruling on a cold, poorly developed record when neither the parties nor the nisi prius court has had a meaningful opportunity to mull the question. While [ Rule] 702 imposes a special obligation upon a trial judge to ensure that any and all scientific testimony ... is not only relevant, but reliable, Daubert did not work a seachange [sic] over ... evidence law, and the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.
Hunt, --- N.C. App. at ----, 792 S.E.2d at 560 (internal citations and quotation marks omitted).
Nevertheless, assuming arguendo that defendant established error, defendant is unable to establish plain error. The State's evidence included both direct and circumstantial evidence that methamphetamine was manufactured at the residence. Agent Wood testified that after visually observing the interior and exterior of the residence, "we knew we had, we met the elements for the manufacture of methamphetamine." Agent Wood also testified as to his interview with defendant during which defendant admitted that he assisted Grindstaff in the manufacture of methamphetamine on two occasions at the residence. Defendant also admitted that multiple items seized at the residence were used to manufacture methamphetamine. Furthermore, the State offered the testimony of Special Agent Cruz-Quinones who confirmed that 87 grams of liquid containing methamphetamine was found at the residence. Accordingly, defendant has failed to demonstrate that any purported error by the trial court would have had a probable impact on the jury's guilty verdicts.
D. Special Agent Cruz-Quinones' Testimony
Next, defendant asserts that the trial court plainly erred by allowing Special Agent Cruz-Quinones' testimony and admitting his laboratory report into evidence. Defendant contends that the reliability of Special Agent Cruz-Quinones' principles and methodology were not established. Defendant cites to State v. Abrams, --- N.C. App. ----, 789 S.E.2d 863 (2016), for the contention that while the expert in Abrams provided a detailed explanation of the systematic procedure adopted by her agency to analyze and identify marijuana, the explanation of laboratory procedures in the present case is "nowhere to be found[.]"
Defendant's argument is premised on the idea that the trial court is required to conduct a reliability proceeding regardless of whether defendant has raised an objection. McGrady holds otherwise:
The trial court has the discretion to determine whether or when special briefing or other proceedings are needed to investigate reliability. A trial court may elect to order submission of affidavits, hear voir dire testimony, or conduct an in limine hearing.... In simpler cases, however, the area of testimony may be sufficiently common or easily understood that the testimony's foundation can be laid with a few questions in the presence of the jury.
McGrady, 368 N.C. at 893, 787 S.E.2d at 11 (internal citations and quotation marks omitted).
In the present case, the State questioned Special Agent Cruz-Quinones as follows:
Q. So do you test pills and liquids and controlled substances to determine exactly what they are?
A. Correct[.]
....
Q. Is there a scientific process that you go through when you're doing that testing?
A. Yes, there is.
Q. Is that scientific process relied upon in your field of study?
A. Yes, it is.
Q. And did you go through that scientific process in this particular case?
A. Yes, I did.
[THE STATE]: Your Honor, at this time the State would tender Mr. Cruz-Quinones as an expert in forensic drug chemistry.
THE COURT: Do you wish to be heard, [defense counsel?]
[DEFENSE COUNSEL]: No, Your Honor.
We note that defendant did not challenge the reliability of Special Agent Cruz-Quinones' testimony, and recognize that as a result, the record is not fully developed as to this issue. However, even assuming arguendo that it was error to admit the challenged testimony, we are not convinced by defendant's argument that Special Agent Cruz-Quinones' testimony amounted to plain error because it "served to dispel any notion that [defendant] possessed insufficient knowledge to be involved in the suspected clandestine operations." Special Agent Cruz-Quinones did not offer any testimony regarding defendant's knowledge of the process of manufacturing methamphetamine. In light of the State's evidence that defendant admitted that methamphetamine was being manufactured at the residence and that he participated in its production, defendant is unable to establish that any purported error amounted to plain error.
NO ERROR.
Report per Rule 30(e).
Judges STROUD and ZACHARY concur.