IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-870

Filed: 16 June 2020

Forsyth County, No. 10 J 226

IN THE MATTER OF: M.M.

Appeal by Respondent-Father from order entered 29 April 2019 by Judge Denise S. Hartsfield in Forsyth County District Court. Heard in the Court of Appeals 26 May 2020.

*Assistant County Attorney Theresa A. Boucher for Petitioner-Appellee Forsyth County Department of Social Services.*

*Matthew D. Wunsche for Appellee-Guardian ad Litem.*

*Morrow Porter Vermitsky & Taylor, PLLC, by John C. Vermitsky and Erin Woodrum, for Respondent-Appellant-Father.*

COLLINS, Judge.

Father appeals from the trial court's order adjudicating his minor child "Molly"[1] abused and neglected. Father argues that the trial court erred or abused its discretion by disallowing a deposition, allowing certain expert testimony, and considering evidence of previous juvenile proceedings and a civil custody order. Father also argues that certain findings of fact were not supported by competent evidence and, even if supported by competent evidence, did not support the trial

---

[1] A pseudonym is used throughout the opinion to protect the identity of the child. *See* N.C. R. App. P. 3.1(b).

court's adjudication of abuse and neglect. We discern no error or abuse of discretion by the trial court, and we affirm the order.

## I. Procedural History and Factual Background

Father and Molly's mother ("Mother")[2] had histories of substance abuse when they met in a rehabilitative program in 2008. "Their courtship was marked by relapses, hospitalizations, domestic violence and extremely careless behavior." They married in 2009, and their daughter Molly was born in October 2010. When Molly was two days old, Mother became intoxicated and argued with Father. They physically struggled while Mother was holding Molly, causing Molly to be dropped onto the hardwood floor. Father called 911, and Mother was taken to the hospital for evaluation. In response to reports from the hospital that Father and Mother were constantly fighting and refused to submit to drug and alcohol tests, the Forsyth County Department of Social Services ("DSS") filed a juvenile petition in October 2010, alleging that Molly was an abused juvenile because her parents created or allowed to be created serious emotional damage to her, and Molly was a neglected juvenile because she lived in an environment injurious to her welfare. The trial court granted custody of Molly to DSS, who placed her with her maternal grandparents. The trial court ordered Father and Mother to complete several rehabilitative programs. That same month, Father and Mother separated. While the juvenile case

---

[2] Mother is not a party to this appeal.

was still pending, Father filed a complaint in December 2010 seeking custody of Molly.

In February 2011, Molly was adjudicated neglected, and DSS continued Molly's placement with her grandparents. In August 2011, Father and Mother divorced and were allowed unsupervised visitation with Molly in their homes. In November 2011, the trial court administratively closed Father's pending custody action and removed it from the calendar.

In April 2012, the trial court conducted a review hearing, after which it entered an order awarding joint custody of Molly to Father and Mother based on a determination that Father and Mother had complied with previous orders and had demonstrated that they could safely care for Molly.

When Mother was hospitalized in March or April 2014 for alcohol-related health issues and was admitted into a treatment program, the trial court granted Father temporary legal and sole physical care, custody, and control of Molly, subject to the appointment of a guardian ad litem ("GAL"). In July 2014, the trial court granted Mother temporary supervised visitation. During interviews with the GAL in 2014 and 2015, Father expressed resentment over having to spend money on Mother and her family, admitted that he had questioned Molly about what happened during her visits with Mother, and tried several times to make Mother appear to be a bad parent. In June 2015, the trial court granted Mother temporary unsupervised

visitation. In September 2015, the trial court entered a temporary order granting Father and Mother shared custody.

A licensed professional counselor who served as Molly's therapist from October 2015 to March 2016 diagnosed Molly with adjustment disorder with mixed depression and anxiety.

In November 2016, the trial court modified the temporary custody order after conducting voir dire of Father and Mother and reviewing a report submitted by the GAL. The trial court ordered Father and Mother to begin co-parenting therapy sessions, in which they should refrain from making personal attacks against each other, and ordered Father to begin counseling sessions with a psychologist. In December 2016, Father admitted to his psychologist that he had said inappropriate things to Molly about Mother. In January 2017, the GAL expressed concerns about negative comments Father had made about Mother. Molly told the GAL that she was happy with her living situation and that she would like to spend more time with Father.

In February 2017, Father told his psychologist that he was frustrated because Mother had failed to bring Molly to a father-daughter event at school and that Father was concerned about how much time Molly was spending with one of Mother's ex-husbands. The psychologist encouraged Father to stop obsessing about Mother and what was going on in her house. During a surprise visit by the GAL to Father's home

in April 2017, Father tried to discuss with the GAL a list he had made of Mother's violations, and the GAL had to tell Father three times not to discuss the matter in front of Molly. During a telephonic conference in April 2017 involving Father, Mother, the therapist, and the GAL, both parents alleged that Molly was telling each of them adverse things that the other had said about them. Father told his psychologist that he thought the therapist was setting him up by putting him in situations in which he would be likely to get upset. During a May 2017 session with the therapist, Father called Mother a sociopath and refused to apologize.

As the therapy sessions were winding down in May 2017, Father was in favor of employing a parenting coordinator going forward, but Mother was opposed. A conversation during a session became heated, and Father said he thought the sessions were designed to destroy his relationship with Molly. In one session, Father said he was frustrated because Molly had told him that Mother blamed everything on him. In their last therapy session in June 2017, Father said he believed Mother was still drinking and complained about Mother's ex-husband's involvement. Mother explained that she was in treatment. In June 2017, Father's psychologist thought Father was making progress and was beginning to put Molly first. The therapy and counseling sessions ended in June 2017.

The trial court held a civil custody hearing that began on 11 July 2017 and ended on 30 August 2017.

While Father and Mother were awaiting the custody order, DSS received a child protective services ("CPS") report on 30 January 2018 indicating that Molly had reported concern over conditions at Father's home. Social worker Janesha Faulk ("Faulk") contacted Molly's pediatrician, Dr. Lia Erickson, on 31 January 2018 and learned that Dr. Erickson had diagnosed Molly with chronic functional abdominal pain related to anxiety, stress, or psychological distress, which Dr. Erickson believed was related to the "family situation" because Molly said she was sick when there were no signs of physical illness. Molly had told Dr. Erickson that Father spanked her for no reason and took her toys out of her room.

Faulk began a CPS investigation on 1 February 2018 by speaking with Molly at Mother's home. Molly told Faulk that Father made her stay in her room until he called her, beat her with a wooden board, fed her only noodles and hot dogs, removed all her toys from her room except one, and painted over the pink walls in her room with white paint. Faulk visited Father unannounced on 5 February 2018 and discovered that Molly's allegations were not true. After Molly admitted to Faulk and Father that she had lied, Father repeatedly asked her why she would do that and blamed Mother for encouraging her to lie. Faulk suggested that they call Mother and try to work it out together over the phone with Faulk as a mediator, but Father "adamantly refused." When Faulk spoke with Molly a few days later, Molly said that

Father continued to talk about and blame Mother. Molly later told Faulk that Father was pressuring her to say she wanted to live with him.

The trial court entered an order on 28 March 2018 granting legal and primary physical custody to Mother and visitation to Father. The order prohibited the parties from denigrating each other in Molly's presence and from attempting to alienate Molly's affection for the other party.[3]

As part of its ongoing investigation, DSS requested that Dr. Christopher Sheaffer, a child psychologist and expert in child and family evaluations referred by the North Carolina Child Medical Examiner's Office, perform a child and family evaluation. Dr. Sheaffer conducted the evaluation in March and April 2018 by interviewing Molly, Father, Mother, and Faulk and considering documents including DSS files, an addendum to a report by the GAL, and the March 2018 custody order.

On 14 June 2018, DSS met with Father and Mother to discuss Dr. Sheaffer's findings and DSS's recommendations. During that meeting, Father demeaned Mother and refused to seriously discuss how to deal with concerns about emotional abuse of Molly. Father and Mother entered into a safety agreement with DSS that prohibited them from badgering, demeaning, or questioning Molly about the other parent; both stated that they understood the agreement.

---

[3] Father appealed the custody order, which this Court affirmed in *McMillan v. McMillan*, 833 S.E.2d 692 (N.C. Ct. App. 2019).

On 3 July 2018, DSS filed a juvenile petition alleging that Molly was abused and neglected. The petition specifically alleged that Molly was an abused juvenile because her parents created or allowed to be created serious emotional damage to her, and Molly was a neglected juvenile because she lived in an environment injurious to her welfare. On the same day, the trial court granted nonsecure custody to DSS, who placed Molly with Mother. On 6 July 2018, the trial court vacated the nonsecure custody order and granted temporary legal custody to Mother. At a second nonsecure custody hearing on 18 July 2018, the trial court ordered that Father should have supervised visitation one hour per week and two phone calls per week to be supervised by Mother.

The trial court held a pre-trial hearing on 16 August 2018, followed by adjudication and disposition hearings beginning on 10 October 2018 and ending on 9 January 2019. The trial court heard testimony from Molly, Father, Faulk, Dr. Erickson, Dr. Sheaffer, and the therapist who had counseled Father and Mother in 2016 and 2017. Dr. Sheaffer testified that Molly had been "chronically subjected to conflict and disagreement between her parents" and that Father had "repeatedly over the course of years displayed poor boundaries in sharing his anger and dissatisfaction" regarding Mother with Molly. Dr. Sheaffer's expert opinion was that "exposure to this conflict and to her father's lack of boundaries reaches the level of emotional abuse."

Molly, who was eight years old at the time of the hearing, testified that (a) she had told lies to try to keep Mother, Mother's family, and herself safe from Father, who had "said a bunch of mean things about [Mother's] family"; (b) Father had been mean to Molly during the time she told the lies to Faulk; (c) she felt "very upset" when Father said that Mother was "spending all of the money"; (d) she felt scared when she could tell from the tone of Father's voice that he was going to be mean; and (e) she did not want to go back to Father's house because she was afraid he would get mad at her.

On 29 April 2019, the trial court entered an order ("Order") adjudicating Molly abused and neglected, granting legal and physical custody to Mother and visitation to Father, and ordering Mother and Father to receive individual and parent counseling.

Father timely filed notice of appeal of the Order.[4]

## II. Discussion

On appeal, Father argues that (1) the trial court erred and abused its discretion by disallowing a scheduled deposition of Faulk; (2) the trial court erred by allowing Dr. Sheaffer to testify as an expert witness; (3) certain findings of fact were not supported by competent evidence; (4) the trial court erred in concluding that

---

[4] At the adjudication hearing, Mother stood mute to the allegations by DSS and is not part of this appeal of the trial court's Order.

Molly is abused and neglected; and (5) the trial court erred by considering evidence of the previous juvenile proceeding and the civil custody order.

### A. Deposition request

Father first argues that the trial court reversibly erred, abused its discretion, and violated Father's due process rights by not allowing Father to depose Faulk.

"We review a trial court's ruling on discovery matters under the abuse of discretion standard." *In re J.B.*, 172 N.C. App. 1, 14, 616 S.E.2d 264, 272 (2005) (citation omitted). "A trial court may be reversed for abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision." *Id.* (citation omitted).

N.C. Gen. Stat. § 7B-700 governs the regulation of discovery under the Juvenile Code in cases involving abuse, neglect, and dependency. The statute provides:

> (a) Sharing of Information. — A department of social services is authorized to share with any other party information relevant to the subject matter of an action pending under this Subchapter. . . .
>
> (b) Local Rules. — The chief district court judge may adopt local rules or enter an administrative order addressing the sharing of information among parties and the use of discovery.
>
> (c) Discovery. — Any party may file a motion for discovery. The motion shall contain a specific description of the information sought and a statement that the requesting party has made a reasonable effort to obtain the information pursuant to subsections (a) and (b) of this section or that the information cannot be obtained

pursuant to subsections (a) and (b) of this section. The motion shall be served upon all parties pursuant to [N.C. Gen. Stat. §] 1A-1, Rule 5. The motion shall be heard and ruled upon within 10 business days of the filing of the motion. The court may grant, restrict, defer, or deny the relief requested. . . ."

N.C. Gen. Stat. § 7B-700 (2019). In juvenile cases, "the Rules of Civil Procedure apply only when they do not conflict with the Juvenile Code and only to the extent that the Rules advance the purposes of the legislature as expressed in the Juvenile Code." *In re E.H.*, 227 N.C. App. 525, 531, 742 S.E.2d 844, 849 (2013) (internal quotation marks and citation omitted).

In this case, Father's counsel noticed a deposition of Faulk, the social worker, on 7 August 2018 under Rule 30 of the North Carolina Rules of Civil Procedure and served a subpoena on Faulk to appear at the deposition. On the same day, Father filed a motion for discovery in the juvenile matter under N.C. Gen. Stat. § 7B-700, which did not include a request for a deposition. At the pre-trial hearing on 16 August 2018, counsel for DSS opposed the noticed deposition, arguing that Father should obtain information provided by Faulk, including her dictated notes, through the information sharing provisions of N.C. Gen. Stat. § 7B-700(a)—not by deposing Faulk under the rules of civil procedure. Counsel for DSS also explained that N.C. Gen. Stat. § 7B-700(c) was the proper vehicle for Father to request a deposition, by filing a motion for discovery in the juvenile proceeding.

The trial court expressed concern that conducting a deposition of Faulk could delay the juvenile adjudication. The trial court further stated:

> But I see this deposition before you've even gone through what's in the file or what's available a shore enough fishing expedition in my mind. I mean so what you're trying to do is really see what else you might be missing that might be underneath. You know, they -- they -- they have an obligation to report what's reported, and the question about anything since this -- since these -- since this last exhibit or whatever, is going to be answered in Court, and I think you will be printing whatever new information is there. So if there was a way that I could streamline and I can't. I don't even know what you plan to ask, and I don't think at this time you do either because you haven't even seen what's there, I'll allow you to recalendar this or to put this back on the table for a deposition after you have reviewed what's in the file.
>
> . . . .
>
> And I will not put any bearing on it being rescheduled once [counsel for Father] has had an opportunity to look at all of the information that the social worker has already provided.
>
> . . . .
>
> You'll have to file something to come back in for the deposition, . . .

Contrary to Father's argument, the trial court did not refuse to allow Father to depose Faulk. Instead, it instructed Father to first avail himself of the information sharing provisions under N.C. Gen. Stat. § 7B-700(a), while explicitly leaving open the possibility that Father could later file a motion for discovery requesting a deposition under N.C. Gen. Stat. § 7B-700(c). As the trial court did not exercise its

discretion under N.C. Gen. Stat. § 7B-700(c) to deny a discovery request, it could not have abused its discretion. Furthermore, the trial court did not err by disallowing a deposition under the Rules of Civil Procedure. The Juvenile Code provides for discovery, specifically including depositions, and thus the Rules of Civil Procedure do not apply here. *See In re E.H.*, 227 N.C. App. at 531, 742 S.E.2d at 849. The trial court merely instructed Father to cancel the noticed civil deposition and affirmed that Father could request a deposition later in the juvenile proceeding.

## B. Expert witness

Father next argues that the trial court erred by allowing Dr. Sheaffer to testify as an expert in psychology and child and family evaluations.

"Whether a witness has the requisite knowledge or training to testify as an expert is within the exclusive province of the trial court, and its decision will not be overturned absent an abuse of discretion." *In re Faircloth*, 137 N.C. App. 311, 315, 527 S.E.2d 679, 682 (2000) (citations omitted). "A ruling committed to a trial court's discretion is to be accorded great deference and will be upset only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision." *In re A.R.D.*, 204 N.C. App. 500, 504, 694 S.E.2d 508, 511 (2010) (internal quotation marks and citation omitted).

North Carolina Rule of Evidence 702 governs admissibility of expert testimony:

> (a) If scientific, technical or other specialized knowledge
> will assist the trier of fact to understand the evidence or to

> determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise, if all of the following apply:
>
> (1) The testimony is based upon sufficient facts or data.
>
> (2) The testimony is the product of reliable principles and methods.
>
> (3) The witness has applied the principles and methods reliably to the facts of the case.

N.C. Gen. Stat. § 8C-1, Rule 702 (2019).

"Rule 702(a) has three main parts, and expert testimony must satisfy each to be admissible." *State v. McGrady*, 368 N.C. 880, 889, 787 S.E.2d 1, 8 (2016). "First, the area of proposed testimony must be based on scientific, technical or other specialized knowledge that will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* (internal quotation marks omitted) (citing Rule 702(a)). "Second, the witness must be qualified as an expert by knowledge, skill, experience, training, or education." *Id.* at 889, 787 S.E.2d at 9 (internal quotation marks omitted) (citing Rule 702(a)). "Third, the testimony must meet the three-pronged reliability test" found in Rule 702(a)(1)-(3). *Id.* at 890, 787 S.E.2d at 9.

On appeal, Father does not argue that Dr. Sheaffer's testimony failed to satisfy the first and second parts of Rule 702, but only argues that the trial court erred by failing to determine that Dr. Sheaffer's testimony satisfied the three-pronged reliability test. Accordingly, we consider whether the trial court abused its discretion

by determining that Dr. Sheaffer's testimony satisfied the three-pronged reliability test.

"The precise nature of the reliability inquiry will vary from case to case depending on the nature of the proposed testimony. In each case, the trial court has discretion in determining how to address the three prongs of the reliability test." *Id.* (citation omitted). This is a "flexible inquiry." *Id.* at 891, 787 S.E.2d at 9.

In this case, the trial court conducted voir dire of Dr. Sheaffer to determine if he was qualified to testify as an expert in psychology and child and family evaluations. After testifying about his education, training, expertise in psychology, and experience performing child and family evaluations, Dr. Sheaffer testified about the facts and data upon which he based his opinion, as follows:

> I reviewed documents provided to me by [DSS], primarily a -- I believe it was a 40-page court report or court order signed by Judge Bedsworth [(the custody order)]. I obtained information from the social worker [(Faulk)] regarding the [CPS] involvement. I reviewed an addendum to a [GAL] report although I was not given the initial report to read. I met with [Molly] on two occasions. I met with each of the parents. I had both of the parents complete behavioral questionnaires regarding [Molly]. I had [Father] complete a questionnaire that addresses coparenting kinds of issues. And I relied on all of that information to form my opinions.

This testimony shows that Dr. Sheaffer formed his opinion based upon sufficient facts or data relevant to this case; thus, the first prong of the reliability test was satisfied. *See* N.C. Gen. Stat. § 8C-1, Rule 702(a)(1).

Dr. Sheaffer also testified about the protocol he used to perform his evaluation:

Q. Dr. Sheaffer, when you perform one of these evaluations and you're asked to look for whether or not there's emotional abuse of a child, what is the protocol you follow for that kind of assessment?

A. As I just described, the protocol involves obtaining, primarily obtaining information from the possible perpetrators, obtaining information from the apparent victim, and as much as possible relying on collateral or corroborative information to determine whether the information provided by the possible perpetrators is accurate or not.

Q. And you said that you employed some questionnaires to the parents. What questionnaires were those?

A. I used a questionnaire called the Clinical Assessment of Behavior or CAB, which is a caregiver report questionnaire that just describes the parents' perspectives regarding a child on a number of dimensions, and I used – I had [Father] complete something called the Parent Alliance Measure to get his perspective of the parenting relationship that he has with [Mother].

Q. And why did you choose only [Father] for the Parenting Alliance Measure test?

A. Primarily because of the degree to which [Father] expressed anger and hostility toward [Mother], but also because of information that was included in [the custody order], information from the [GAL], information from DSS indicated that [Father] had a history of and his discussion with me suggested he currently had a great deal of anger and animosity toward [Mother].

Q. So you used questionnaires. Did you use any psychometric testing on the parties?

A. Well, you would consider both of those to fit the criteria for psychometric testing, but I didn't use any others.

Q. Both of what?

A. The CAB and the Parent Alliance Measure.

Q. Okay. Why did you choose the CAB?

A. Because it's a good questionnaire.

Q. Okay. What is that questionnaire trying to fish out?

A. In the case of the CAB, I was trying to gather a sense of both parents' perspectives of [Molly] regarding behavioral, social, emotional, academic kinds of processes.

Q. Is there a definition of emotional abuse that you're using?

. . . .

A. I can give you my working definition of emotional abuse. I'm not basing this on the legal definition. From a mental health perspective, emotional abuse occurs when a caregiver is providing parenting or acting in a way toward a child that creates an undue emotional stress and burden on them and that action is outside what would be considered the norm for the culture.

Q. So where does that definition come from?

A. 30 years of practice and reading and studying.

Q. Okay. That's not a DSM diagnosis in your field?

A. There is a DSM diagnosis of a child who has been emotionally abused, yes.

Q. There is a DSM diagnosis for child emotional abuse?

A. There's a -- there is discussion in the DSM about emotional abuse, about a child who has experienced emotional abuse.

Q. So what axis is that diagnosis on?

A. The axes have been taken away. There are no longer axes 1, 2, and 3.

Q. But there's a numbered definition, it's your testimony, for emotional abuse?

A. As I recall, yes, but I couldn't tell you.

Q. What paper, journal article, anything generally accepted in your field are you taking this definition from?

A. I'm taking it as a -- as a totality from all of the information that I have gleaned over the years.

Q. So rather than using reliable, peer-reviewed, evidence-based definition, you were using your definition --

. . . .

A. I would disagree. I think what I am explaining or attempting to explain is that the definition, the working definition that I use is gathered from a number of different definitions that are peer reviewed and scientifically based.

Q. So you're gathering your own definition that you're calling a working definition?

A. My perspective regarding whether or not the child has been abused is based on my perception about what emotional abuse is, which is based on the research and data that have been conducted over 50 years.

Q. So in your field as a doctoral-level practitioner, there is such a thing as evidence-based practice, correct?

A. Yes.

Q. Okay. And there are tests that you can employ to determine the level of mental anguish a child is experiencing, for example?

A. Yes.

Q. Okay. And you could use different psychometric testing to determine if the person in front of you has different mental health conditions?

A. Not to determine, to give information to assist in the clinical diagnosis.

Q. Okay. And you didn't mention performing any of that testing on [Molly], is that correct?

A. I did not do direct assessment of [Molly]. I relied on the caregiver report questionnaires, which is fairly typical of the child at 7.

Q. Okay. So it's fairly typical to rely on those?

A. It -- yes. It's the standard of practice.

> Q. Okay. Is it part of the standard of practice to employ other psychometric testing that gives you actual data?
>
> A. I -- this gives actual data.
>
> Q. What gives actual data?
>
> A. The CAB, which I believe your question infers that I'm not getting data from it. But that is not correct. There is data that is obtained from the child -- the Clinical Assessment of Behavior.

This testimony shows that Dr. Sheaffer followed a clinical protocol for determining if a child has been emotionally abused, which included interviewing relevant individuals; reviewing behavioral and parenting questionnaires completed by the parents; and analyzing documents and historical information provided by DSS, the GAL, and the social worker. This evidence is sufficient to support a determination that Dr. Sheaffer's testimony was the product of reliable principles and methods, which Dr. Sheaffer applied reliably to the facts of this case. Thus, the second and third prongs of the reliability test were satisfied. *See* N.C. Gen. Stat. § 8C-1, Rule 702(a)(2), (3).

Because the evidence was sufficient to satisfy the three prongs of the reliability test, we reject Father's argument that the trial court did not consider or establish the requirements of this test in determining that Dr. Sheaffer's testimony was reliable. *See McGrady*, 368 N.C. at 890-91, 787 S.E.2d at 8-9 (noting that the three-pronged reliability test is a "flexible inquiry"). Accordingly, the trial court did not abuse its

discretion by allowing Dr. Sheaffer to testify as an expert in psychology and child and family evaluations.

### C. *Findings of fact*

Father next argues that the trial court's findings of fact 9, 10, 13, 16, and 21 are not supported by competent evidence.

"The role of this Court in reviewing a trial court's adjudication of neglect and abuse is to determine (1) whether the findings of fact are supported by clear and convincing evidence, and (2) whether the legal conclusions are supported by the findings of fact." *In re T.H.T.*, 185 N.C. App. 337, 343, 648 S.E.2d 519, 523 (2007) (internal quotation marks and citation omitted). "If such evidence exists, the findings of the trial court are binding on appeal, even if the evidence would support a finding to the contrary." *Id.* (citation omitted). "The trial court determines the weight to be given the testimony and the reasonable inferences to be drawn therefrom. If a different inference may be drawn from the evidence, the trial court alone determines which inferences to draw and which to reject." *Id.* (internal quotation marks, brackets, and citation omitted). "Unchallenged findings of fact are binding on appeal." *Peters v. Pennington*, 210 N.C. App. 1, 13, 707 S.E.2d 724, 733 (2011) (citation omitted).

*i. Findings of fact 9, 10, and 21*

Father challenges the following findings of fact:

9. Based upon the evidence presented by both medical and psychological experts, the court finds that [Molly] has lived in a constant state of chronic emotional abuse based upon the stress created by the conflictual relationship of her parents.

10. [Molly] has been exposed to her parent's [sic] high conflict relationship and lived in a state of chronic emotional abuse. She has lived a life of stress that would be hard for someone as young as she to overcome.

. . . .

21. On or about June 26, 2018, [DSS] received information from [Molly's] pediatrician, Dr. Lia Erickson. [Molly] was diagnosed with Functional Abdominal pain. Dr. Erickson reported:

"I have diagnosed [Molly] with function abdominal pain. She exhibited signs and symptoms consistent with this diagnosis including inability to clearly describe the pain being located throughout her abdomen instead of one specific location, inability to describe particular triggers such as food, and lack of symptoms that would point to an organic cause of pain (such as weight loss, vomiting, diarrhea, constipation, urinary symptoms). In most children with functional abdominal pain, the pain is triggered by psychological distress. As I explain it to families, it is their body's way of telling them that they are worried or stressed about something. [Molly] did seem anxious to me when describing her symptoms. It was also concerning to me that she had not disclosed her pain to her father but complained frequently to her mother. In my opinion, she did not seem to feel comfortable or safe talking about her pain with her father."

These findings of fact are supported by clear and convincing evidence. The civil custody order admitted as an exhibit at the adjudication hearing contained nearly 40 pages describing the history of conflict between Father and Mother and its emotional impact on Molly. Dr. Sheaffer testified that Molly was emotionally abused by Father,

who lacked boundaries in sharing with Molly his anger and dissatisfaction regarding Mother. Dr. Sheaffer offered an expert opinion that Molly had "chronically been subjected to conflict and disagreements between her parents." Dr. Erickson testified that she thought Molly's stomachaches were related to stress or anxiety and that Molly was afraid to talk to Father about it. Finally, Faulk's testimony, discussed directly below, is further evidence supporting these findings.

*ii. Finding of fact 13*

Father challenges the following finding of fact:

> 13. Over the course of the CPS investigation, the DSS social worker continued to receive information that[:] 1) [Molly] reports that [Father] continues to blame [Mother] for the CPS investigation, 2) [Molly] was having stomach aches which correlated to visits with [Father], [and] 3) [Molly] reported her [Father] telling her upsetting stories regarding her maternal family.

Finding of fact 13 is supported by clear and convincing evidence. Faulk testified that she had observed Father blaming Mother in front of Molly and that Molly told her that it was upsetting when Father talked about Mother's family and blamed Mother, that she was afraid of Father getting mad at her, that Father pressured her to say she wanted to live with him, and that she did not want to visit Father at his house. Faulk also testified that Molly said her stomach felt better when she was not at Father's house.

*iii. Finding of fact 16*

Father challenges the following finding of fact:

> 16. [Father] did not follow the terms of [the civil custody] order as well as the Safety Plan he entered into with [DSS] as they related to his continued disregard for [Molly's] emotional needs.

The civil custody order prohibited Father and Mother from denigrating each other in Molly's presence and from attempting to alienate Molly's affection for the other party. The safety agreement between DSS and Father and Mother prohibited the parents from demeaning or questioning Molly about the other parent. Finding of fact 16, that Father failed to abide by these requirements, is supported by clear and convincing evidence, including Molly's testimony that Father had "said a bunch of mean things" about Mother's family, Father had been mean to her, she felt "very upset" when Father said that Mother was "spending all of the money," she felt scared when she could tell from the tone of Father's voice that he was going to be mean, and she did not want to go back to Father's house because she was afraid he would get mad at her.

In summary, we conclude that all five of the challenged findings of fact are supported by clear and convincing evidence.

## D. Abuse and neglect

Father next argues that even if the findings of fact are supported by competent evidence, the trial court erred by concluding that Molly was abused and neglected.

Whether a child is abused or neglected is a conclusion of law, which we review only to determine whether it is supported by the findings of fact. *In re Helms*, 127 N.C. App. 505, 510-11, 491 S.E.2d 672, 675-76 (1997).

The Juvenile Code defines abuse and neglect of juveniles as follows:

> (1) Abused juveniles. — Any juvenile less than 18 years of age . . . whose parent, guardian, custodian, or caretaker:
>
> . . . .
>
> e. Creates or allows to be created serious emotional damage to the juvenile; serious emotional damage is evidenced by a juvenile's severe anxiety, depression, withdrawal, or aggressive behavior toward himself or others[.]
>
> . . . .
>
> (15) Neglected juvenile. — Any juvenile less than 18 years of age . . . whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; . . . or who lives in an environment injurious to the juvenile's welfare; . . .

N.C. Gen. Stat. § 7B-101 (2019). An adjudication of abuse may be based on emotional damage and anxiety caused by actions of parents during marital conflict and custody disputes. *Powers v. Powers*, 130 N.C. App. 37, 42, 502 S.E.2d 398, 401 (1998) (findings supported adjudication of abuse, where juvenile's personality changed from energetic to depressed as parents' conflict worsened, her stomach hurt when her parents fought, and being removed from one parent's home alleviated stomach problems). To adjudicate a juvenile neglected, a trial court must establish "some physical, mental, or *emotional impairment* of the juvenile or a substantial risk of such impairment as a consequence of the failure to provide proper care, supervision, or discipline." *In re*

*J.A.M.*, 372 N.C. 1, 9, 822 S.E.2d 693, 698 (2019) (internal quotation marks and citation omitted) (original emphasis omitted and emphasis added).

In this case, the trial court found as fact that (1) Molly "lived in a constant state of chronic emotional abuse based upon the stress created by the conflictual relationship of her parents"; (2) Molly had been exposed to her parents' "high conflict relationship," "lived in a state of chronic emotional abuse," and "lived a life of stress that would be hard for someone as young as she to overcome"; (3) Father "acted angry," "continuously questioned" Molly regarding who or what "made her say things about him," and told Molly that Mother "made her say those things"; (4) Dr. Sheaffer concluded that Molly had been chronically subjected to emotional abuse; and (5) Molly told Faulk that Father continued to talk about Mother and Mother's family when Molly visited with him.

These findings of fact support the conclusion that, as a result of the conflict between her parents, Molly suffered serious emotional damage, evidenced by her anxiety and health issues, which was injurious to her welfare. *See* N.C. Gen. Stat. § 7B-101(1), (15). As in *Powers*, the factual findings regarding Molly's emotional abuse being exacerbated by Father's anger, repeated attempts to demean and blame Mother, and pressure on Molly during the custody dispute, support an adjudication of abuse. These findings also support a finding of emotional impairment necessary for an adjudication of neglect. *In re J.A.M.*, 372 N.C. at 9, 822 S.E.2d at 698.

Therefore, the trial court's findings of fact support its adjudications of abuse and neglect, and we discern no legal error by the trial court.

### *E. Prior juvenile adjudication and civil custody order*

Father finally argues that the trial court erred by considering "evidence and impressions not before the court"—specifically, the 2010 juvenile adjudication and the civil custody order.

In a juvenile proceeding adjudicating a petition for abuse, neglect, or dependency, the trial court must protect the due process rights of the juvenile and the juvenile's parents while determining the existence or nonexistence of the conditions alleged in the petition. N.C. Gen. Stat. § 7B-802 (2019). As such, the trial court should limit its consideration to only the matters alleged in the petition. *In re D.C.*, 183 N.C. App. 344, 349, 644 S.E.2d 640, 643 (2007). "Where the juvenile is alleged to be abused, neglected, or dependent, the rules of evidence in civil cases shall apply." N.C. Gen. Stat. § 7B-804 (2019).

In this case, the DSS petition explicitly alleged (a) that Molly had been in DSS custody from October 2010 to April 2012 "due to the conflictual relationship and substance abuse concerns" of Father and Mother and that Molly had been adjudicated neglected on 21 February 2011; and (b) that a trial court had entered a civil custody order on 28 March 2018 finding that Father was "still obsessed with denigrating and demonizing" Mother, Father was telling Molly things "designed to lessen [Molly's]

love and affection" for Mother—which was not in Molly's best interest, and Father had shown that he could not or would not attempt to promote a loving relationship between Mother and Molly.

Because the prior juvenile court involvement and the civil custody order were among the matters alleged in the petition, the trial court did not violate Father's due process rights by considering this evidence. *See In re D.C.*, 183 N.C. App. at 349, 644 S.E.2d at 643. Moreover, Father cites no rule of evidence that precludes admissibility of a civil custody order in determining whether there is clear and convincing evidence of matters alleged in a juvenile petition. Thus, we reject Father's argument that the trial court's consideration of the prior juvenile court involvement and the civil custody order violated his due process rights.

### III. Conclusion

We find no abuse of discretion or error by the trial court, and we conclude that the findings of fact were supported by clear and convincing evidence and supported the trial court's conclusions of law. Accordingly, we affirm the Order adjudicating Molly abused and neglected.

AFFIRMED.

Chief Judge McGEE and Judge DIETZ concur.