IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-684

No. COA22-216

Filed 18 October 2022

Rowan County, No. 18 CRS 51710

STATE OF NORTH CAROLINA

v.

DEDRIC MICHELLE MASON

Appeal by defendant from judgment entered 23 September 2021 by Judge Lori I. Hamilton in Rowan County Superior Court. Heard in the Court of Appeals 23 August 2022.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Kimberly N. Callahan, for the State.*

*Marilyn G. Ozer for defendant-appellant.*

ZACHARY, Judge.

¶ 1 Defendant Dedric Michelle Mason appeals from a judgment entered upon a jury's verdict finding her guilty of second-degree murder. On appeal, Defendant challenges the exclusion of her expert's testimony and the admission of the lay opinion testimony of a State's witness. After careful review, we conclude that Defendant received a fair trial, free from prejudicial error.

***Background***

¶ 2        Defendant and James Davis were acquaintances, and although Defendant knew Mr. Davis's longtime girlfriend, Cheviss Bennett, she had not interacted with her much prior to the early morning hours of 21 April 2018. However, Defendant's friend, Andrea Dillard, had a more complicated history with Mr. Davis and Ms. Bennett. Sometime before 21 April 2018, Ms. Bennett saw Mr. Davis walking Ms. Dillard to her car outside of FishZilla Arcade in Salisbury, North Carolina. Ms. Bennett immediately confronted Mr. Davis in the parking lot; Mr. Davis, Ms. Bennett, and Ms. Dillard then began "exchanging words" regarding the nature of Mr. Davis's interactions with Ms. Dillard. Mr. Davis ended his relationship with Ms. Bennett.

¶ 3        At approximately 1:00 a.m. on 21 April 2018, Defendant and Ms. Dillard arrived at FishZilla. Mr. Davis and Ms. Bennett were already present at the arcade; having reconciled following their argument with Ms. Dillard, they were playing together at one of the gaming tables when Defendant and Ms. Dillard arrived. Despite Ms. Dillard and Ms. Bennett's acrimonious relationship, Defendant and Ms. Dillard opted to sit at the same gaming table as Mr. Davis and Ms. Bennett, because sitting at a table "that's been paid into" by active players would allow Defendant and Ms. Dillard "to get money quicker[.]"

¶ 4        After a few minutes, an argument ensued. Ms. Bennett refused to play with Defendant and Ms. Dillard, and she repeatedly asked Mr. Davis if he was ready to

leave. Defendant and Ms. Dillard exchanged insults with Ms. Bennett, and the conflict escalated, with all three women shouting loudly. Curtis Quick, II, a FishZilla employee, and Robert Livengood, the security guard, approached the table and directed the group to quiet down or to leave. Ms. Bennett and Mr. Davis decided to leave in order to avoid Defendant and Ms. Dillard; Defendant and Ms. Dillard also decided to leave at the same time. Consequently, the four wound up standing together at the front counter, waiting to "cash out." The arguing continued and began to intensify. At one point, Mr. Davis placed his cell phone on the counter, and Defendant threw it across the room.

¶ 5        The argument between Defendant and Mr. Davis then became physical. Despite video recordings from multiple angles inside the arcade, as well as interviews of numerous eyewitnesses, the identity of the initial aggressor remains unclear, although Defendant and Ms. Dillard both claimed that Mr. Davis was the aggressor. Mr. Quick observed "some intense shoving" and "punches" between Defendant and Mr. Davis. Mr. Livengood witnessed Defendant "make a strike toward . . . [or] raise her hand toward" Mr. Davis and saw Mr. Davis push Defendant into the ATM near the front counter. Ms. Bennett saw Mr. Davis put his arm out near Defendant to push her back. After some shoving between Defendant and Mr. Davis, Defendant was knocked into the ATM, hit her head, and landed on the floor.

¶ 6        At trial, Ms. Dillard and Defendant testified that Mr. Davis began to attack Ms. Dillard after she told him to stop punching Defendant while Defendant was on the floor. However, Ms. Bennett and Mr. Livengood testified that it was Ms. Dillard who initiated an assault upon Mr. Davis while he was still engaged in the conflict with Defendant.

¶ 7        As Mr. Davis and Ms. Dillard were fighting, they tripped over a chair and fell to the floor. Mr. Davis then put his hands around Ms. Dillard's throat. Ms. Dillard testified at trial that in that moment, she believed that her life was in danger: "I really thought he was going to take my life. He continued to attack me, and as he was choking me, I'm beginning to black out and I really thought my life was about to be over."

¶ 8        Although Defendant yelled for help, no one in FishZilla responded. Accordingly, once Defendant was able to stand, she walked over to where Ms. Dillard and Mr. Davis were fighting on the floor, pulled out her handgun, and fired. Defendant shot Mr. Davis twice while he was on top of Ms. Dillard, once in the back and once in the chest. Mr. Davis later died from these injuries.

¶ 9        Defendant testified that she initially shot Mr. Davis because she believed that he was going to kill Ms. Dillard. She testified that she fired a second shot because "he hadn't reacted to the first shot at all"; after the first shot, Mr. Davis "was still on top of [Ms. Dillard] and didn't really move or stop[.]" Defendant also stated that she fired

twice because she was trained in her concealed carry class "to shoot until there's no longer a threat."

¶ 10        On 14 May 2018, a Rowan County grand jury returned a true bill of indictment charging Defendant with second-degree murder. The matter came on for trial in Rowan County Superior Court on 14 September 2021. Defendant maintained throughout the trial that she had acted in self-defense and defense of others.

¶ 11        On 23 September 2021, the jury returned its verdict finding Defendant guilty of second-degree murder. The trial court entered judgment upon the jury's verdict and sentenced Defendant to a term of 150 to 192 months in the custody of the North Carolina Division of Adult Correction. Defendant gave notice of appeal in open court.

## *Discussion*

¶ 12        On appeal, Defendant argues that the trial court abused its discretion by (1) "precluding [her] from putting on expert testimony" concerning the principles of self-defense and use of force, and (2) admitting Ms. Bennett's lay opinion testimony as to whether she believed that anyone was in danger prior to the shooting that evening.

    I.    *Standard of Review*

¶ 13        A trial court's decision regarding whether proffered expert testimony meets the requirements of Rule 702(a) of the North Carolina Rules of Evidence "will not be reversed on appeal absent a showing of abuse of discretion." *State v. McGrady*, 368 N.C. 880, 893, 787 S.E.2d 1, 11 (2016) (citation omitted). "[A] trial court may be

reversed for abuse of discretion only upon a showing that its ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision." *Id.* (citation omitted). This standard of review applies "whether the trial court has admitted or excluded the testimony[.]" *Id.*

¶ 14        Similarly, "[w]hether a lay witness may testify as to an opinion is reviewed for abuse of discretion." *State v. Dove*, 274 N.C. App. 417, 422, 852 S.E.2d 681, 685 (2020) (citation omitted), *disc. review denied*, 376 N.C. 666, 853 S.E.2d 151 (2021).

## II.  Expert Opinion

¶ 15        Defendant first argues that the trial court abused its discretion by excluding her expert's testimony because the principles of self-defense and use of force "are not common knowledge[.]" Defendant contends that she was prejudiced by the exclusion of this testimony, in that it violated her "federal and state constitutional rights to put on witnesses in [her] defense, to have a fair trial and due process." We disagree.

### A. *Defendant's Proffer of Expert Testimony*

¶ 16        In a pretrial hearing on 10 September 2021, Defendant proffered the testimony of three retired Rowan County law enforcement officers—Investigator Samuel Henline, Sheriff George Wilhelm, and Sergeant Carl Dangerfield. During voir dire, the trial court determined that it would reserve its ruling on the admissibility of the expert testimony until "the time that . . . Defendant seeks to introduce that testimony" at trial.

¶ 17        Defendant called Investigator Henline and Sheriff Wilhelm as witnesses at trial, but did not call Sergeant Dangerfield. Sheriff Wilhelm briefly testified regarding his experience as a concealed carry instructor. Defendant then proffered Investigator Henline's testimony. During his second voir dire, Investigator Henline first testified as to his qualifications and background. He had over 35 years of experience in law enforcement and was "a certified general law enforcement instructor[,]" but his specialty was arson and explosives investigations.

¶ 18        Investigator Henline clarified that his training on the use of deadly force differed from Defendant's because he received his training as a law enforcement officer; as such, he did not testify to the instructions regarding the use of deadly force that Defendant received in her civilian concealed carry class. Investigator Henline explained that when he trains law enforcement officers regarding the use of deadly force, he instructs that "there is not a specified number" of shots to fire in response to a threat, but rather, they should "shoot until the threat stops." He noted, however, that two shots would typically suffice for this purpose. Investigator Henline opined that civilians are justified in using deadly force "to protect themselves or a third party from imminent death or bodily -- serious bodily injury."

¶ 19        Investigator Henline next explained that he typically uses "the scientific method with a systematic approach" to formulate his opinions, pursuant to which he collects evidence, conducts interviews, and submits his findings to peer review. In

preparing for Defendant's case, he reviewed the State's discovery, watched the video recording of the shooting "[s]everal" times, and interviewed Defendant and Ms. Dillard regarding the shooting. Based on this investigatory work, Investigator Henline formed the opinion that it was reasonable for Defendant "to believe that she was being threatened . . . at the time she fired her pistol[.]"

¶ 20    After Investigator Henline's second voir dire, the trial court concluded:

> To allow a witness to testify in the form of an opinion on the issues of reasonableness of the belief that force was necessary on the part of the Defendant or an opinion regarding whether or not the force used was excessive, that opinion being drawn from the observation of the witness of the same exact evidence or less than the jury has seen and heard this past seven days would be in the Court's opinion an invitation to the jury to substitute the expert's judgment of the meaning of the facts of the case for its own.
>
> I have heard no testimony regarding what kind of scientific method or systematic approach was used, and in the Court's opinion the proffered evidence is intended to cast a sheen of technical and scientific methodology onto a concept of which a lay person, and specifically in this case a jury member, would probably already be aware or would be able to discern from the jury member's observation of the evidence in the case, that this proffered testimony does not provide insight beyond the conclusions that jurors can readily draw from their ordinary experience and/or from their observations of the evidence presented.

¶ 21    Thus, the court excluded Defendant's proffered expert testimony pertaining to the principles of self-defense and use of deadly force, as well as Investigator Henline's opinion as to the reasonableness of Defendant's actions. The trial court permitted

Investigator Henline to testify regarding the mechanics of the firearm and ammunition used by Defendant.

*B. Analysis*

¶ 22    "Whether expert witness testimony is admissible under Rule 702(a) is a preliminary question that a trial judge decides pursuant to" N.C. Gen. Stat. § 8C-1, Rule 104(a) (2021). *McGrady*, 368 N.C. at 892, 787 S.E.2d at 10. "To the extent that factual findings are necessary to answer this question, the trial judge acts as the trier of fact. The court must find these facts by the greater weight of the evidence. . . . [T]hese findings will be binding on appeal unless there is no evidence to support them." *Id.* at 892–93, 787 S.E.2d at 10–11 (citations omitted). From its findings of fact, the trial court must then determine "whether the proffered expert testimony meets Rule 702(a)'s requirements of qualification, relevance, and reliability." *Id.* at 893, 787 S.E.2d at 11.

¶ 23    Rule 702(a) establishes the criteria by which a court determines the admissibility of proffered expert testimony:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise, if all of the following apply:
>
> > (1) The testimony is based upon sufficient facts or data.

> (2) The testimony is the product of reliable principles and methods.
>
> (3) The witness has applied the principles and methods reliably to the facts of the case.

N.C. Gen. Stat. § 8C-1, Rule 702(a).

¶ 24    As noted above, "Rule 702(a) has three main parts, and expert testimony must satisfy each to be admissible." *McGrady*, 368 N.C. at 889, 787 S.E.2d at 8. First, the witness must be "qualified as an expert[,]" such that the witness is "in a better position than the trier of fact to have an opinion on the subject[.]" *Id.* at 889, 787 S.E.2d at 9 (citation omitted). "Expertise can come from practical experience as much as from academic training." *Id.* "As is true with respect to other aspects of Rule 702(a), the trial court has the discretion to determine whether the witness is sufficiently qualified to testify in that field." *Id.* at 890, 787 S.E.2d at 9.

¶ 25    Second, the expert testimony must be relevant; that is, it must "assist the trier of fact to understand the evidence[.]" *Id.* at 889, 787 S.E.2d at 8 (citation omitted). "In order to 'assist the trier of fact,' expert testimony must provide insight beyond the conclusions that jurors can readily draw from their ordinary experience." *Id.* (citation omitted). Further, the expert "testimony must do more than invite the jury to substitute the expert's judgment of the meaning of the facts of the case for its own." *Id.* (citation and internal quotation marks omitted).

¶ 26          Our Supreme Court addressed the issue of relevance in *McGrady*, in which it concluded that the proffered expert testimony in the science of "use of force" was not relevant to support the defendant's assertion of self-defense. *Id.* at 895, 787 S.E.2d at 12. The Court agreed with the trial court's determination that the expert's testimony concerning pre-attack cues, use-of-force variables, and reaction times "would not assist the jury because these matters were within the jurors' common knowledge." *Id.* Thus, the exclusion of the expert's testimony did not constitute an abuse of discretion because it would not have assisted the jury in deciding whether the defendant acted in self-defense: "The factors that [the expert] cited and relied on to conclude that [the] defendant reasonably responded to an imminent, deadly threat are the same kinds of things that lay jurors would be aware of, and would naturally consider, as they drew their own conclusions." *Id.*

¶ 27          Third, "the trial court must assess the reliability of the testimony to ensure that it complies with the three-pronged test in Rule 702(a)(1) to (a)(3)." *Id.* at 892, 787 S.E.2d at 10. As detailed above, Rule 702(a) provides: "(1) The testimony [must be] based upon sufficient facts or data. (2) The testimony [must be] the product of reliable principles and methods. (3) The witness [must have] applied the principles and methods reliably to the facts of the case." N.C. Gen. Stat. § 8C-1, Rule 702(a)(1)–(3). "The primary focus of the inquiry is on the reliability of the witness's principles and methodology, not on the conclusions that they generate . . . ." *McGrady*, 368 N.C.

at 890, 787 S.E.2d at 9 (citations and internal quotation marks omitted). "However, conclusions and methodology are not entirely distinct from one another, and . . . the court is not required to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.* (citation and internal quotation marks omitted).

¶ 28 On appeal, Defendant asserts that the trial court should have permitted Investigator Henline to testify to his opinion regarding the reasonableness of Defendant's use of deadly force because the "proffered testimony met the *McGrady* standards." She further argues that Investigator Henline was properly qualified as an expert, and that his expertise was necessary to help the jury assess "when a second shot is excessive force[,]" a concept that Defendant contends "is not common knowledge[.]" This assertion is unpersuasive.

¶ 29 In the instant case, the trial court excluded Investigator Henline's testimony regarding self-defense and deadly force because his testimony "d[id] not provide insight beyond the conclusions that jurors can readily draw from their ordinary experience and/or from their observations of the evidence presented." In that Investigator Henline's proffered testimony did not satisfy the requirements of Rule 702(a) as articulated in *McGrady*, we conclude that the trial court did not abuse its discretion by excluding it.

¶ 30 Although Investigator Henline was unquestionably qualified to testify concerning the use-of-force training of *law enforcement officers*, he was not

sufficiently familiar with the use-of-force training of *civilians* to testify as an expert on the subject. As Investigator Henline readily admitted during voir dire, he "fell under a different category on concealed carry permit" as a law enforcement officer and "didn't have to take [the] concealed carry" class taught to civilians. Consequently, he could not testify to what civilians learn in their concealed carry classes. By contrast, Defendant testified as to what she learned about the use of deadly force in her concealed carry class. And as the trial court noted, "probably close to half of [the] jurors ha[d] a concealed carry permit and ha[d] taken the class presumably in order to get it." Therefore, Investigator Henline did not "have enough expertise to be in a better position than the trier of fact to have an opinion on the subject" of civilians' use-of-force training. *Id.* at 889, 787 S.E.2d at 9. As such, he was not sufficiently qualified to provide an expert opinion as to the reasonableness of Defendant's actions in the present case. *See id.*

¶ 31        Furthermore, Investigator Henline's proffered expert testimony did not satisfy Rule 702(a)'s relevance requirement because no specialized knowledge was required to determine the reasonableness of Defendant's actions. As he testified during the pretrial voir dire, Investigator Henline formed his opinion on this issue after he reviewed the State's discovery, interviewed Defendant and Ms. Dillard, and watched the video recording multiple times. The jury, likewise, had the ability and opportunity to consider the same materials: the State presented its evidence during its case-in-

chief; Defendant and Ms. Dillard testified about the night of the shooting; and both the State and Defendant played the video recording multiple times for the jury. The jury also had the opportunity to hear directly from Defendant regarding her concealed carry training, which many of the jurors had also received.

¶ 32        Accordingly, the testimony of Investigator Henline would not have "assist[ed] the trier of fact to understand the evidence or to determine a fact in issue," N.C. Gen. Stat. § 8C-1, Rule 702(a), and therefore, was not relevant. Indeed, Investigator Henline's proffered expert testimony regarding the use of deadly force and the reasonableness of Defendant's actions would have impermissibly "invite[d] the jury to substitute [his] judgment of the meaning of the facts of the case for its own." *McGrady*, 368 N.C. at 889, 787 S.E.2d at 8 (citation and internal quotation marks omitted).

¶ 33        Moreover, Defendant has failed to establish that Investigator Henline's opinion was "the product of reliable principles and methods." N.C. Gen. Stat. § 8C-1, Rule 702(a)(2). The trial court found that Investigator Henline's testimony regarding his methods of investigation "cast a sheen of technical and scientific methodology onto a concept of which a lay person, and specifically in this case a jury member, would probably already be aware or would be able to discern from the jury member's observation of the evidence in the case[.]" A review of the record supports this finding. Investigator Henline testified to using "the scientific method with a systematic

approach[,]" by which he collects evidence, conducts interviews, and submits his finding to peer review. However, as described above, the jury necessarily performed a similar review of the evidence in determining whether Defendant acted reasonably. Accordingly, because the proffered opinion testimony was "connected to existing data only by [Investigator Henline's] *ipse dixit*[,]" *McGrady*, 368 N.C. at 890, 787 S.E.2d at 9 (citation omitted), we conclude that the trial court's determination "that this testimony would simply be an effort to cast a sheen of technical and scientific methodology onto a concept into which a lay person, particularly a jury member, would probably already be aware" was not "manifestly unsupported by reason[,]" *id.* at 893, 787 S.E.2d at 11 (citation omitted).

¶ 34      In sum, Investigator Henline lacked sufficient "expertise to be in a better position than the trier of fact to have an opinion on the subject" of the appropriate use of force by civilians. *Id.* at 889, 787 S.E.2d at 9. Further, "[t]he factors that [he] cited and relied on to conclude that [D]efendant reasonably responded to an imminent, deadly threat are the same kinds of things that lay jurors would be aware of, and would naturally consider, as they drew their own conclusions." *Id.* at 895, 787 S.E.2d at 12. In addition, "the court [wa]s not required to admit [the] opinion evidence," as it was "connected to existing data only by the *ipse dixit* of the expert." *Id.* at 890, 787 S.E.2d at 9 (citation and internal quotation marks omitted). Therefore,

the trial court did not abuse its discretion by excluding Investigator Henline's opinion testimony. *Id.* at 893, 787 S.E.2d at 11.

¶ 35 Defendant next asserts that Investigator Henline's testimony was necessary for her defense because "the jury did not have 'the same exact' knowledge of the video" as Investigator Henline. Specifically, she contends that because the jurors viewed the low-resolution video from a distance due to COVID-19 protocols, Investigator Henline's testimony would have been "very helpful" to the jury to explain what was happening; hence, Defendant argues, the trial court abused its discretion by excluding it. This argument lacks merit.

¶ 36 A careful review of the record reveals that the trial court went to great lengths to ensure that the jurors could view the video recording while remaining socially distanced due to the COVID-19 pandemic. Before the trial began, the court instructed the jurors to "[r]aise [their] hand[s]" or "[s]ay something" if they could not properly see the evidence. The trial court also informed the jury that the court "will do whatever [it] can to make sure that you are able to see and hear and observe all of the evidence[.]" Additionally, a television was placed in front of the jurors in lieu of the television mounted to the courtroom wall to allow for better visibility. Upon publishing the video recording of the shooting to the jury for the first time, the trial court instructed the State to move the television as close to the jury as possible, and it reiterated its prior instructions regarding jurors' view of the television: "If you

cannot see and see clearly, folks, raise your hand. We'll stop it. We'll make adjustments. You folks adjust if you need to move." None of the jurors expressed any difficulty seeing the video while the recording played. Moreover, the court granted the jury's request during deliberations to view the recording again, playing the video once at half-speed and again at full speed.

¶ 37    The trial court's astute actions precluded the need for Investigator Henline to narrate the events of the video to the jury; his narration would not have further "assist[ed] the trier of fact to understand the evidence[.]" N.C. Gen. Stat. § 8C-1, Rule 702(a). The court's decision to exclude such testimony, therefore, did not constitute an abuse of discretion. *McGrady*, 368 N.C. at 893, 787 S.E.2d at 11.

### III.    *Lay Opinion*

¶ 38    Defendant next asserts that the trial court abused its discretion and committed prejudicial error by allowing Ms. Bennett to testify, over Defendant's objection, to her opinion as to the level of danger to the persons present at FishZilla that evening prior to the shooting. Again, we disagree.

¶ 39    Rule 701 of the North Carolina Rules of Evidence permits a lay witness to offer "opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." N.C. Gen. Stat. § 8C-1, Rule 701. Our Supreme Court has interpreted this Rule as permitting a lay witness to testify to an opinion that is "a shorthand

statement of fact, or, in other words, the instantaneous conclusions of the mind as to the appearance, condition, or mental or physical state of persons, animals, and things, derived from observation of a variety of facts presented to the senses at one and the same time[.]" *State v. Roache*, 358 N.C. 243, 294, 595 S.E.2d 381, 414 (2004) (citations and internal quotation marks omitted).

¶ 40        Relatedly, Rule 704 provides that "[t]estimony in the form of an opinion or inference is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." N.C. Gen. Stat. § 8C-1, Rule 704. The Rule thus allows for "admission of lay opinion evidence on ultimate issues, but to qualify for admission the opinion must be helpful to the jury." *State v. Elkins*, 210 N.C. App. 110, 124, 707 S.E.2d 744, 754 (2011) (citation omitted). Furthermore, "while opinion testimony may embrace an ultimate issue, the opinion *may not* be phrased using a legal term of art carrying a specific legal meaning not readily apparent to the witness." *State v. Najewicz*, 112 N.C. App. 280, 293, 436 S.E.2d 132, 140 (1993), *disc. review denied*, 335 N.C. 563, 441 S.E.2d 130 (1994).

¶ 41        "However, even if the trial court erred by allowing such testimony, the defendant must show that the error was prejudicial." *Dove*, 274 N.C. App. at 422, 852 S.E.2d at 685; *see* N.C. Gen. Stat. § 15A-1443(a). "In determining whether a criminal defendant is prejudiced by the erroneous admission of evidence, the question is whether there is a reasonable possibility that, had the evidence not been admitted,

the jury would have reached a different verdict." *State v. Malone-Bullock*, 278 N.C. App. 736, 2021-NCCOA-406, ¶ 17 (citation omitted), *disc. review denied*, 379 N.C. 682, 865 S.E.2d 863 (2021). "Further, if certain evidence is admitted without objection, the admission of subsequent evidence of similar a character cannot be objectionable." *State v. Delau*, 381 N.C. 226, 2022-NCSC-61, ¶ 32 (concluding that the defendant could not demonstrate prejudice from the admission of lay opinion testimony because other admitted evidence included substantially similar information). Constitutional errors are generally prejudicial "unless the appellate court finds that it was harmless beyond a reasonable doubt." N.C. Gen. Stat. § 15A-1443(b).

¶ 42        In the instant case, Defendant's challenge to Ms. Bennett's opinion testimony concerns the following exchange:

> [THE STATE:] Ms. Bennett, based on your observation of the events unfolding that night and now I'm specifically referring to the early morning hours of April 21, 2018, did you feel that anyone's life was in danger?
>
> [MS. BENNETT:] No.
>
> [THE STATE:] Did you feel that anyone's life or anyone was in imminent danger of serious bodily harm?
>
>          . . . .
>
> [MS. BENNETT:] No.

¶ 43          Defendant first argues that the trial court should have excluded Ms. Bennett's opinion as to whether anyone at FishZilla was in danger on the evening in question because her opinion on this issue impermissibly "invade[d] the province of the jury[.]" According to Defendant, "[t]he jurors had more information concerning the danger Ms. Dillard was in than Ms. Bennett because they had heard Ms. Dillard's testimony that she was blacking out and believed Mr. Davis was killing her." Defendant also contends that the challenged portion of Ms. Bennett's testimony was tantamount to an opinion as to whether Defendant's use of deadly force was reasonable, which she contends was an element of the crime with which Defendant was charged.

¶ 44          In fact, whether Defendant's use of deadly force was reasonable was an ultimate issue at trial in light of Defendant's self-defense claim. Opinion testimony, however, "is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." *Id.* § 8C-1, Rule 704. Nor did Ms. Bennett's testimony impermissibly invade the province of the jury, as she did not phrase her opinion "using a legal term of art carrying a specific legal meaning not readily apparent to" her. *Najewicz*, 112 N.C. App. at 293, 436 S.E.2d at 140. Rather, she appropriately provided one-word answers to the prosecutor's carefully crafted questions. Further, Ms. Bennett's opinion was "helpful to the jury": as a participant in the conflict, Ms. Bennett was uniquely qualified to speak to the overall level of danger at FishZilla in the moments

leading up to the shooting. *Elkins*, 210 N.C. App. at 124, 707 S.E.2d at 754 (citation omitted).

¶ 45        Nevertheless, assuming, *arguendo*, that the trial court erroneously admitted Ms. Bennett's opinion testimony, Defendant cannot demonstrate prejudice. Although Defendant correctly notes that a "violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt[,]" N.C. Gen. Stat. § 15A-1443(b), she fails to articulate how the admission of Ms. Bennett's opinion testimony amounted to a constitutional violation. Citing no case law or statutory authority, Defendant simply contends that "[a]llowing lay opinion evidence concerning an element of the crime violated [her] constitutional right to a fair trial and due process." As such, we have no legal basis upon which to review this alleged error. *See* N.C.R. App. P. 28(b)(6). In that "[i]t is not the role of this Court to craft [D]efendant's arguments for h[er,]" *State v. Earls*, 234 N.C. App. 186, 192, 758 S.E.2d 654, 658, *disc. review denied*, 367 N.C. 791, 766 S.E.2d 643 (2014), Defendant's prejudice argument pursuant to N.C. Gen. Stat. § 15A-1443(b) fails.

¶ 46        Defendant next argues that because "[t]he jurors in this case would have been sympathetic toward a woman whose common law husband and father of her children had been shot in her presence[,]" there was a reasonable possibility that the jury

would have acquitted Defendant if the trial court had not admitted Ms. Bennett's opinion testimony. The argument is also unavailing.

¶ 47        As the State articulates in its appellate brief, the trial court admitted without objection substantially similar evidence regarding the level of danger at FishZilla that evening. Mr. Quick stated at trial that he did not believe that it was necessary to call 9-1-1 prior to the shooting, given that the altercation had lasted for less than a minute at that point. Mr. Livengood testified that although he had a firearm on his person that evening, he never brandished his weapon; when asked whether he believed that either Defendant or Ms. Dillard "was in danger of serious, imminent harm" that night, Mr. Livengood replied, "No." Because "other admitted evidence included substantially similar information" as Ms. Bennett's challenged lay opinion, *Delau*, 381 N.C. 226, 2022-NCSC-61, ¶ 33, Defendant cannot demonstrate that "there is a reasonable possibility that, had the evidence not been admitted, the jury would have reached a different verdict[,]" *Malone-Bullock*, 278 N.C. App. 736, 2021-NCCOA-406, ¶ 17 (citation omitted). Accordingly, her argument is overruled.

¶ 48        Finally, Defendant argues that the trial court abused its discretion in admitting Ms. Bennett's lay opinion because her opinion "was based on inadmissible character evidence[,]" as described in Rule 404 of the North Carolina Rules of Evidence. However, careful review of the transcript reveals that Defendant did not raise this argument before the trial court. Therefore, this issue was not preserved for

appellate review. *See* N.C.R. App. P. 10(a)(1) (requiring a party to present to the trial court a timely objection "stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context" and "to obtain a ruling upon the party's . . . objection" to preserve an issue for appellate review).

¶ 49 "Where a defendant objects to the admission of evidence before the trial court and states a specific ground as the basis for that objection, but raises a different ground as the basis for his argument on appeal, the issue is not preserved." *State v. Gettleman*, 275 N.C. App. 260, 272, 853 S.E.2d 447, 455 (2020) (concluding that the defendant had not preserved for appellate review his argument that the challenged evidence was inadmissible as speculative lay-opinion testimony under Rule 701 where the defendant argued hearsay and confrontation grounds below), *disc. review denied*, 377 N.C. 557, 858 S.E.2d 286, 290 (2021).

¶ 50 Here, Defendant's counsel explicitly asked that his objection to Ms. Bennett's opinion "be noted under the Sixth and Fourteenth Amendment[s]." Defense counsel also argued that Ms. Bennett's opinion was not "relevant to the issue of self-defense or defense of others from her perspective." After hearing arguments from the parties, the trial court overruled Defendant's objection on both of the asserted grounds.

¶ 51 Our appellate courts have "long held that where a theory argued on appeal was not raised before the trial court, the law does not permit parties to swap horses

between courts in order to get a better mount" on appeal. *State v. Sharpe*, 344 N.C. 190, 194, 473 S.E.2d 3, 5 (1996) (citation and internal quotation marks omitted). Accordingly, Defendant may not present her new argument for appellate review.

### *Conclusion*

¶ 52      The trial court did not abuse its discretion by excluding Defendant's expert's testimony regarding the use of force and self-defense, and Defendant has failed to demonstrate that she was prejudiced by the admission of the lay opinion testimony of a witness for the State. Thus, we conclude that Defendant received a fair trial, free from prejudicial error.

NO PREJUDICIAL ERROR.

Chief Judge STROUD and Judge DIETZ concur.